284 F.Supp. 483 (1968)
METAL LUBRICANTS COMPANY, a corporation, Plaintiff,
v.
ENGINEERED LUBRICANTS CO., a corporation, Donald A. Wachter, Fred Fleschner, Mel Kohl, Jr., and Charles Weston, Jr., Defendants.
No. 68 C 7(1).
United States District Court E. D. Missouri, E. D.
March 14, 1968.
Donald W. Bird, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for plaintiff.
Alphonso H. Voorhees, Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., for defendants.

MEMORANDUM OPINION AND ORDER
HARPER, Chief Judge.
Plaintiff seeks an injunction against former employees of its St. Louis Sales Office who have resigned as a group and formed a competing company. The action is in three counts, alleging a conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, unfair competition, and breach of fiduciary duties. Each count contains a prayer for injunctive relief as well as money damages.
Jurisdiction appears under 28 U.S. C.A. § 1332, 28 U.S.C.A. § 1337, and the doctrine of pendant jurisdiction. Applications for preliminary and final injunctions were consolidated and a hearing was held before the court commencing on January 18th. The testimony and depositions put in evidence reveal the following factual situation:
The plaintiff, Metal Lubricants Company, deals primarily in custom-made lubricating oils and compounds intended for specific applications in the field of machine metal work, such as cutting, grinding and drilling. It makes all of the oils it sells except one. The manufacturing plant and the main office are in Chicago and there are several sales and warehousing offices around the country. The St. Louis office sold to about 300 customers prior to the disruption of its *484 business in December of last year. Yearly sales of the company at that time were approximately two million dollars, of which about one-sixth, or $300,000.00, was accounted or by the St. Louis office.
Sales depend to a large extent on the quality of service. Sixty to seventy percent of the company's sales are made to large plants and require visits by sales personnel to work out the exact needs of the machinery involved. It takes two or three years of experience before new salesmen are profitable to the company.
Defendant, Donald A. Wachter, was associated with Metal Lubricants for nine years prior to the acceptance of his resignation in December of 1967. For the first three years he was an independent distributor, and for the last six he was a commissioned salesman and St. Louis Division Manager, for which he was paid additional amounts reflecting his administrative duties. Before going with Metal Lubricants he had completed a sales engineering course with a major oil company and had sold the same type of product for that company in a territory including most of the St. Louis area. He had several large customers which became customers of Metal Lubricants. At that time it appears that Metal Lubricants had only one customer of consequence in the St. Louis area.
The other individual defendants, Fred Fleschner, Mel Kohl, Jr., and Charles Weston, Jr., comprised the rest of the sales and administrative force of the St. Louis office, with the exception of one additional salesman, Jack Thacker, who has remained with Metal Lubricants. When they resigned in December, 1967, Fleschner had been with Metal Lubricants for about three years; Weston and Kohl about one year. Fleschner and Kohl were salesmen, the former being remunerated essentially on a commission basis, the latter receiving salary plus expenses. Weston was a salaried employee with administrative duties. In addition, the St. Louis office included four girls who performed part time or full time secretarial work and who also resigned with Wachter. Engineered Lubricants Company is the new concern formed by Wachter and the other St. Louis employees of Metal Lubricants shortly after they resigned.
The resignations did not come suddenly, but were preceded by a considerable period of dissatisfaction with the status of the St. Louis office and negotiations respecting a change in that status.
Wachter first manifested dissatisfaction with the division sales office arrangement in an offhand remark made in Florida in April of 1967. The setting was a tennis match between Wachter and Art Hinkel, vice-president of Metal Lubricants and brother of Hull Hinkel, the president and founder. Wachter told Hinkel that he would prefer to see the St. Louis office turned into a jobber, as this measure of independence would obviate certain conflicts which had arisen between the St. Louis and Chicago offices. Hinkel testified that he offered no encouragement, that he did not take the idea seriously, and that he felt that it would be absurd to spin off the St. Louis office after the years of expense put into it. Wachter broached the subject again in July, with about the same effect. This time he wrote Art Hinkel and received a reply from the latter flatly rejecting such a change and stating that in view of the expense involved in creating the St. Louis office, "[w]e would be naive, indeed, to revert to a Jobber-Distributor set up * * *."
It appears that the basic conflict underlying Wachter's desire for a change may have had to do with the manner of expanding sales, although other matters, such as product quality, were mentioned as having been important. Testimony by Wachter indicates that the St. Louis office was interested in conducting extensive surveys of industrial oil needs for certain large corporations, presumably with the object in mind of capturing a larger part of the business of these customers. Art Hinkel's July letter corroborates *485 this, referring to Wachter as "the super salesman", but attempting to cool his ardor for increased sales at the expense of company profitability. Metal Lubricants was apparently in some financial difficulty, if only of the very mildest sort, and it may be inferred that the expansive attitude of the St. Louis office gave rise to friction.
Wachter remained unhappy about the situation and decided to bring it to a head. In the course of a routine telephone call to Chicago in late September he told Art Hinkel that he intended to resign, and was about to submit a letter for that purpose which he had prepared sometime before. Hinkel came to St. Louis at once to look into the situation. He learned in the course of discussions with Wachter and the other St. Louis employees that the former had been considering the move for some time, that he planned to compete with Metal Lubricants selling the same line of products and calling on the same customers, that he had contacted suppliers to determine whether it was feasible, and that the other St. Louis employees were aware of the situation and generally intended to follow Wachter. There was no mention at this time of the possibility of remaining with Metal Lubricants as a jobber or distributor. Wachter's letter of resignation was submitted with an effective date of November 30th, providing sixty days' notice pursuant to his employment contract.
A few days later the Hinkels asked Fleschner, the senior salesman in St. Louis next to Wachter, to come to Chicago, which he did on October 6th. Fleschner was offered the division managership, but declined, indicating his loyalty to Wachter and his intention to go with him in the new enterprise. At the close of the day's discussion Fleschner suggested that although the Hinkels would not consider a jobber arrangement, a distributorship might still be acceptable. Art Hinkel indicated that this was possible, but only if the distributorship sold Metal Lubricant's products exclusively.
When Fleschner returned to St. Louis, Wachter promptly wrote Hull Hinkel, indicating that he was anxious to talk over the distributorship idea. Hull Hinkel came to St. Louis on October 12th and two days of discussions followed. Apparently, Wachter and Fleschner were at first unwilling to accept an exclusive distributorship, but by the second day had relented. Notes were taken at a session on the second day with the intent of recording essential points on which the parties were agreed. After Hinkel had returned to Chicago, the notes were typed up and forwarded to him, and were submitted by him to his lawyers to be turned into a draft of an exclusive distributorship agreement. In the meantime it was orally agreed that the effective date of Wachter's resignation would be extended to December 31st.
The St. Louis office received a copy of the Chicago draft by November 18th. It contained the following recitation under the heading "Preambles":
"A dispute has arisen between Company and Sales Agent and Sales Agent has manifested his intention to resign from Company's employ for the purpose of competing against Company, using such of its other employees, confidential information, trade secrets and customer lists as he might be able to obtain."
Apart from the gratuitous inclusion of this comment by the Chicago office (there had been no mention of preambles at the conference in St. Louis), the draft appears to have presented no major stumbling blocks with the exception of a clause relating to termination of the agreement. The distributorship was to last for three years and then be terminable at the will of either party on ninety days' notice. However, there was a covenant not to compete for one year following termination for any reason. A revised draft sent to Chicago by Wachter's attorney on November 21st eliminated the covenant not to compete and added a provision for termination at the death of Hull Hinkel.
*486 At the same time Wachter and Fleschner were attempting to continue negotiations on matters which were not fully covered by the initial Chicago proposal. Wachter wrote on November 18th acknowledging receipt of the draft and expressing some dismay that it did not fully reflect "the spirit of our St. Louis meeting." He went on to say that he would continue to attempt to negotiate and thought that it was best to concentrate first on the question of prices, which had been partially treated, although evidently not in a precise manner, in an attachment to the Chicago draft. He also suggested that perhaps direct negotiations should be commenced between the attorneys for each side. Because Wachter had to be out of town on business, Fleschner wrote on November 20th listing specific problems which remained to be worked out concerning prices.
After the Chicago office was sent the redrafted agreement on November 21st, it appears that the only further correspondence between the parties prior to the acceptance of Wachter's resignation in the latter part of December was a letter from Wachter to Hull Hinkel dated December 8th. In it, Wachter noted that he had not heard from Hinkel respecting the negotiations for two weeks, and that, in light of the fact that he would be away for a week, time was again becoming short and another extension of the effective date of his resignation might be desirable.
The Hinkels' testimony indicates that they had, in effect, abandoned negotiations a few days after receipt of the St. Louis redraft reflecting what they considered irreconcilable differences on the question of termination provisions. They then decided to accept Wachter's resignation as of December 31st and to call Jack Thacker to Chicago for the purpose of offering him the division managership. Thacker came on the 10th of December and accepted the job. A letter notifying Wachter was sent on December 15th, but did not reach him until the 20th. Thacker returned to St. Louis on the 10th, but Wachter was out of town, and the first person to be told was Mel Kohl on the 16th. Kohl informed Wachter, who had by then returned. In the course of the next several days, all of the St. Louis employees came into the office, resignations were submitted, and desks cleaned out. Upon learning that the other employees would not remain until the 31st, Hull Hinkel wrote Wachter accepting his resignation immediately.
The new company, Engineered Lubricants, was set up quickly thereafter in quarters at one time occupied by Metal Lubricants. In the short period of its existence Engineered Lubricants has engaged chiefly in preparations for an active business, such as compiling lists of prospects, engaging suppliers, and subjecting samples of competitors' products to laboratory analysis for the purpose of developing its own line of products. Few sales have been made due to a current lack of products, although a number of customers have been contacted. They have been for the most part plaintiff's customers.
Plaintiff charges that defendants have formed a conspiracy in violation of the Sherman Act, entered into unfair competition with Metal Lubricants, and breached fiduciary obligations to it. Each of the three counts contains an allegation respecting the misappropriation of various types of information. It is, therefore, necessary to begin by determining to what extent proprietary rights of Metal Lubricants have been violated, in particular by the taking of trade secrets.
The complaint alleges that the defendants obtained through their employment and have made use of names and addresses of customers and knowledge of customers and knowledge of customer requirements. It goes on to state that customer lists, correspondence, individual customer surveys, and product specifications and formulas were copied or removed from plaintiff's premises. Putting aside the use of general retained knowledge of St. Louis office customers, which defendants certainly admit, the *487 proof of any one of these allegations is sketchy at best.
When defendants cleared out their personal belongings after learning of Thacker's appointment as the new division manager, Thacker was there to supervise and approve everything which was taken. In fact, they were allowed to keep, as they always had been, salesmen's copies of invoices showing the customer's name and address, the type of oil purchased, and the price. Apart from this, it is quite apparent that information pertaining to customers, their requirements, and Metal Lubricant's prices, to the extent that such knowledge is important to the new concern, could be readily assembled from memory, or by checking with old customers.
The few items taken without Thacker's knowledge that in plaintiff's view contain confidential information fall generally in this category. Fleschner admitted to keeping an old price list which he used to determine whether Engineered Lubricants would be able to offer its products at competitive prices. Kohl retained a business diary in which he made short notations for the purpose of keeping track of appointments and the like.
In the course of the hearing a good deal of emphasis was placed on the defendants' use of information concerning the physical properties and ingredients of plaintiff's various oils. There was much testimony, often not very clear, about the difference between "formulas", "specifications" and "inspections", and the extent to which Metal Lubricants divulged these to its salesmen and customers. The evidence shows that the working properties of a product were freely disclosed, while the exact ingredients and their percentages were often kept in strictest secrecy. Hull Hinkel testified that access to the Chicago laboratory was carefully limited, that even the employees who blended products knew the ingredients only by code name, and that salesmen needing information on a product were to talk to the Hinkels or their administrative assistant, not the laboratory employees. On the other hand, salesmen could find out if certain ingredients were present in order to determine whether a product was acceptable for use with particular machinery. Such information was often obtained at the request of customers and passed on to them.
Within these limits the practices employed are not so clear. The testimony is conflicting as to whether product information was ever given to sales personnel without authority to pass it on to customers. The witnesses who said that it was did not describe with precision what sort of information was involved. No specific instances of the practice were shown, and it appears that the St. Louis office was in the habit of providing customers, ordinarily without objection from Chicago, all the information it had. In any event, in light of the policy of secrecy at the head office, any information reaching St. Louis which was intended to be confidential, however the St. Louis office treated it, was probably of little importance.
Plaintiff stresses testimony that Wachter made statements to the effect that he intended to, or knew how to, duplicate some of Metal Lubricant's products, in particular one called Melkut 5591. There was no testimony indicating how he might have obtained actual formulas. Wachter testified that Melkut 5591 was among the products being analyzed by an independent laboratory for Engineered Lubricants. It appears that modern techniques of analysis are capable of determining the exact molecular components of such a product, although the method of combining ingredients might not be disclosed.
The strict standards of Missouri law in the area of trade scerets compel the conclusion that plaintiff has failed to show any substantial misappropriation of protected information. The court is guided in this matter by the recent and very thorough opinion of the Missouri Supreme Court in National Rejectors, Inc. v. Trieman, 409 S.W.2d 1 (Mo.1966).
*488 The Missouri court relied heavily on the Restatement definition of trade secrets (Restatement of Torts, § 757, comment b), which, speaking in broad terms, places primary emphasis on the general unavailability and efforts to protect the information in question. Some excerpts from this definition are as follows:
"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. * * * Generally it relates to the production of goods * * *." It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.
"* * * [A] substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. * * * Some factors to be considered * * * are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."
In National Rejectors, the claimed trade secrets were such things as the dimensions and tolerances of slug rejecting devices for vending machines. Although great precision was necessary to make the devices work and defendants had access to and in some instances probably used plaintiff's exact figures, the court did not find it difficult to conclude that the requisites of protectable information were largely absent. In the instant case this is even more plainly so.
Defendants were denied access to the more valuable product information. There was considerable evidence, supported by expert testimony on behalf of defendants, that even this information could often be obtained by proper means  through laboratory analysis, if not general gleanings from the trade. The court thus concludes that what little product information defendants were given in confidence cannot be held to be subject to protection as trade secrets.
Defendants have, of course, carried with them a considerable amount of helpful information respecting sales of industrial oils in the territories they covered. Through their knowledge of the market and personal contacts they may be able to capture substantially all of plaintiff's business. But the knowledge they will use for this purpose is nonetheless generally unprotectable. It is obvious that the identity of the customers with which the St. Louis office dealt is not a trade secret. The important ones were the companies in the area which had use for large quantities of industrial oils, known to anybody in the business. As to their individual requirements, such data is not common knowledge to the same extent. But it is still information obtainable without recourse to misappropriation from a former employer. There is no reason to doubt that most price information is similarly obtainable.
Defendants were shown to have taken and used only a few items of recorded information of such a marginal nature that intentional wrongdoing cannot be inferred. None of these items were shown to contain data which was subject to a confidence and at the same time unavailable to defendants should they attempt to find it out by other means. On the other hand, by far the more important class of information, that which defendants took with them in their heads, under the law they were *489 privileged to take. As the court states in National Rejectors, "* * * the fact of employer-employee relationship is not, by itself, sufficient to cause a confidential relationship to exist as to knowledge which is the natural product of the employment." 409 S.W.2d 35.
Absent proof that a substantial amount of information classifiable as trade secrets was misappropriated with the result of irreparable harm to its competitive position, grounds for injunctive relief are lacking under each of plaintiff's three theories of action. Apart from the taking of protected information, no right to relief, legal or equitable, appears under any one of the three counts.
Count III charges that defendants individually and as members of a conspiracy breached fiduciary duties owed to plaintiff. The conduct of the St. Louis employees as respects the deteriorating relationship with the head office in Chicago leading up to the December resignations has been set out in detail. It has been seen that Wachter was unhappy for some time with the district office arrangement, that he made his feelings known prior to taking action, that negotiations of apparent good faith resulted, and that the Chicago office was chiefly responsible for the breakdown of these negotiations. It may be added that over this period, or even before the Hinkels were first made aware of the problem, there were informal discussions in the St. Louis office of the possibility of a change, and that an independent, competing business was certainly among the eventualities contemplated. Indeed, defendants contacted numerous suppliers, looked into the possibility of leasing a former office of the St. Louis division, and even discussed the raises which would be given each employee of the new company.
These facts do not make out a breach of defendants' fiduciary obligations. In the National Rejectors case, the defendant-employees entered into a secret, written agreement to embark on a competing enterprise, and had actually set up facilities to copy and manufacture the coin handling devices involved while still in the employ of defendant. Discussing the question of fiduciary duties, the court said, 409 S.W.2d 26-27:
"The law recognizes that employees may agree among themselves to compete with their then employer upon termination of their employment. Restatement, Agency (2d) § 393, comment e. Such employees are not limited merely to so agreeing during their employment with the employer with whom they intend to compete. They may plan and prepare for their competing enterprises while still employed. Keiser v. Walsh, 73 App.D.C. 167, 118 F.2d 13, 14. If such right is to be in any way meaningful for an employee not under contract for a definite term, it must be exercisable without the necessity of revealing the plans to the employer. See Midland-Ross Corporation v. Yokana, 3 Cir., 293 F.2d 411, 413[3]."
Plaintiff cites two decisions of the Kansas City Court of Appeals, Southwest Pump & Machinery Co. v. Forslund, 225 Mo.App. 262, 29 S.W.2d 165 (1930), and Opie Brush Co. v. Bland, 409 S.W.2d 752 (Mo.App.1966), which involved factual situations remarkably similar to each other, although not to the instant case. In Southwest Pump, the business involved began as a partnership selling pumps and similar machinery. The defendant contributed no capital, but was the most active of the partners in terms of sales efforts. When the firm was incorporated he received an equal portion of the common stock and was made president and a director. Apparently because he felt that he was the mainstay of the operation he became dissatisfied with his share of the profits. Some consideration was given among the former partners to buying or selling one another's stock, but defendant, while holding such an offer under consideration, decided to go off on his own. He arranged to obtain the agency of the corporation's principal suppliers, while still its president, *490 and then resigned to, in effect, take over all of its business.
In Opie Brush, the plaintiff company was also at one time a partnership, with defendant the holder of a forty percent interest. For a number of years he was second man in the business, as sales manager before the partnership was formed, then as partner, and finally as first vice-president, director, and major stockholder after incorporation. When disputes arose with his former partner who had become president of the corporation, defendant resigned as sales manager, but not as vice-president or director, and joined a competing firm taking with him information which the court described as "confidential and secret". 409 S.W. 2d 756.
In each of these cases it was found that the defendant had breached his fiduciary obligations to the company. The court in Opie Brush relied heavily on its Southwest Pump decision, emphasizing the defendant's continuing directorship and the inconsistency of his conduct with that position. With respect to both cases it seems obvious that a person who is a director of a corporation, and bears an actual relationship to it like that of a partner in a small business, is under far stricter obligations than an ordinary employee when he decides to leave and take his part of the trade with him. In any event, were these cases not distinguishable, as they clearly are, the issue would nonetheless be controlled by the rule stated by the Missouri Supreme Court in National Rejectors.
The only other Missouri case cited of any relevance is Charles Reilly Optical Co. v. Burke, 41 S.W.2d 909 (Mo.App. 1931). There the plaintiff was a retail firm in the business of testing customers' eyes and providing glasses. The defendant, a clerk, secretly copied lists containing each customer's name, address, and particular optical requirements which had been complied over a long period of time. These lists were of great value in the business and were kept under lock and key. Although the court does not specifically employ the term, this is plainly a case of misappropriation of information having all of the characteristics of trade secrets. It is of no help to plaintiff here.
It is quite evident that if plaintiff's request for injunctive relief on the basis of breach of fiduciary duty is foreclosed in the absence of showing that a substantial amount of protected information was taken, the same must be true of its second count charging unfair competition. Plaintiff seems to have relied exclusively on trade secrets in the portions of its briefs devoted to Count II. The court is unable to see any other theory on which unfair competition could be found under the circumstances of this case.
There remains only plaintiff's first count setting forth a claim for violation of Section 1 of the Sherman Antitrust Act. Plaintiff cites three decisions dealing with conspiracies to injure a competitor's business by drawing away important employees. See Perryton Wholesale, Inc. v. Pioneer Distributing Co., 353 F.2d 618 (10th Cir. 1965); Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1st Cir. 1960); Albert Pick-Barth Co. v. Mitchell Woodbury Corp., 57 F.2d 96 (1st Cir. 1932). In each of these cases an established competitor was a member of the conspiracy and tortuous conduct in the nature of unfair competition was involved. To hold that the defendants' tacit agreement that they might go into business in competition with plaintiff was a conspiracy in restraint of trade, much less one constituting an unreasonable restraint, would be to go far beyond these cases. The court thinks that competition was not lessened, and was probably fostered by defendants' move, although certainly plaintiff's business has suffered, and it, therefore, concludes that the Sherman Act authorizes no injunctive relief on the facts shown.
For the foregoing reasons the application of the plaintiff, Metal Lubricants Company, for an injunction is denied.