METAL LUBRICANTS CO., an Illinois
Corporation, Appellant,

v.

ENGINEERED LUBRICANTS CO., a Missouri Corporation, Donald A. Wachter,
Fred Fleschner, Mel Kohl, Jr., and
Charles Weston, Jr., Appellees.

No. 19400.

United States Court of Appeals
Eighth Circuit.

June 6, 1969.

Donald W. Bird, of Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for appellant.

Alphonso H. Voorhees, of Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., for appellees.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

LAY, Circuit Judge.

This is an appeal from a district court's interlocutory judgment, pursuant to 28 U.S.C. § 1292(a) (1), denying relief against defendants for allegedly appropriating plaintiff's trade secrets, as well as conspiring to leave plaintiff's employment and entering into unlawful competition in violation of Section 1 of the Sherman Anti-Trust Act, (15 U.S.C. § 1). Plaintiff's applications for preliminary and final injunctions were consolidated and Chief Judge Harper held that the defendants did not wrongfully

appropriate any trade secrets and that defendants' employees did not enter into a conspiracy to restrain trade in violation of Section 1 of the Sherman Act. We affirm.

The facts are detailed in the opinion of the district court found in 284 F.Supp. 483 (E.D.Mo.1968). Briefly summarized, the evidence shows that the plaintiff, Metal Lubricants Company, manufactures and sells lubricating oils and compounds. In 1961, plaintiff hired defendant Wachter as its Division Manager in the St. Louis area. Wachter was originally an independent distributor in St. Louis and sold plaintiff's products. He brought with him several large customers when he became Division Manager. In the spring of 1967, Wachter told plaintiff's officers that he thought many conflicts between the St. Louis division office and the home office in Chicago could be resolved if he once again became an independent distributor. The idea was rejected by plaintiff's officers. In September of 1967, Wachter told plaintiff's Vice President, Art Hinkle, that he intended to resign and that he planned to go into competition with plaintiff's company. He also stated that the other employees of the St. Louis division were aware of his plans and that in all probability they would come with him. Wachter then submitted a letter of resignation effective November 30, providing sixty days notice pursuant to his employment contract.

Thereafter plaintiff's officers initiated discussion with Wachter as to the feasibility of an exclusive dealership to handle Metal Lubricants products. Because of this it was orally agreed that Wachter's resignation be extended to December 31. These negotiations were broken off by Metal Lubricants Company after an exchange of proposed contracts with Wachter. On December 10, plaintiff hired one of the other St. Louis salesmen, Jack Thacker, to assume Wachter's position as Division Manager. Wachter received notice of this fact on December 20. All of the other employees learned of Thacker's new appointment and prior

to the time that Wachter was notified, they resigned. Plaintiff, upon learning this, notified Wachter on December 20 that his resignation would be accepted immediately.

Thereafter, defendants established Engineered Lubricants Company and went into direct competition with the plaintiff. One of plaintiff's salesmen, Fred Fleschner, became Vice President of Engineered Lubricants Company. He had previously been employed by plaintiff for approximately three years. When Wachter first gave notice of his intention to resign in September, plaintiff called Fleschner to Chicago and offered him Wachter's position. Fleschner declined and told plaintiff that he wanted to go with Wachter in his new enterprise whatever it might be.

Besides Fleschner, Wachter and Thacker (plaintiff's new Division Manager) the only other administrative employees were Mel Kohl, Jr. and Charles Weston. The latter was an administrative employee on salary. Kohl was a salesman working on commission basis. Both had been with plaintiff company for only one year.

In addition to the above employees, four secretaries resigned and went with Wachter. Three of these girls had been with Wachter prior to 1961 when he operated independently before going with Metal Lubricants. These girls were part-time employees. Plaintiff company had long expressed dissatisfaction with the employment of the part-time girls and had asked Wachter to terminate them. Art Hinkle had felt since the employment of Weston, as the Administrative Assistant, that part-time help in administration was no longer necessary. The fourth girl was a new full-time secretary whom Wachter had hired only a few weeks previous to his resignation. She, too, went with the new company.

■■■ It is claimed that the defendants have wrongfully appropriated trade secrets of plaintiff company. Basically the alleged "trade secrets" consist of (a) customer lists, (b) price lists and (c) secret formulas of plaintiff's lubricants. Chief Judge Harper found that no proof of wrongful appropriation of any trade secrets has been shown to justify injunctive relief. The record amply supports this finding. The names of customers, as well as plaintiff's pricing policy, were contained in commission invoices which were authorized by plaintiff's officials to be taken by the individual defendants when they left the company. This case is not factually comparable to those where customer lists are secretly maintained. Cf. Heyman v. AR. Winarick, Inc., 325 F.2d 584 (2 Cir. 1963). The consumers of lubricating oils are of general knowledge in the field and as such plaintiff posseses no proprietary interest as to the names of its customers. Cf. E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8 Cir. 1969).

The price lists were likewise published information and were generally known. Defendants' use of these prices for comparative purposes reflects nothing more than ordinary business acumen with the desire to be competitive. Nor is there proof that defendants have acquired any secret formulas of plaintiff's products. There exists only evidence of attempted physical emulation by selling similar items supplied by other sources. During the trial defendants produced a list of their new products showing comparative utility to plaintiff's products. This evidence hardly demonstrates any attempt to disparage plaintiff's product unfairly.

■■ Our consideration of this issue is controlled by Missouri law. In National Rejectors, Inc. v. Trieman, 409 S.W.2d 1 (Mo.1966), the Supreme Court of Missouri set up strict standards of proof to sustain a claim for wrongful appropriation of trade secrets. In that case the court denied relief where it was alleged that defendants had misappropriated designs of coin rejectors. The court stated that the defendants could have obtained the information by measuring the devices and arriving at their dimensions by trial and error and noted

that no effort had been made to conceal any of the parts of the finished product.

The Restatement of Torts § 757, comment a, relates that a trade secret is protected against "employment of improper means to procure the trade secret * * *." Cf. Tlapek v. Chevron Oil Co., 407 F.2d 1129 (8 Cir. 1969). There exists no showing under Missouri law that the information obtained by the defendants was in any way given to them in confidence or that it was appropriated by them through "improper means." In fact, the evidence supports just the contrary.

■■■ Complaint is also made that defendants violated their duty of loyalty to the plaintiff company by inducing all of its St. Louis employees away from the St. Louis division in order to harm plaintiff's competitive standing in that area. The district court relied upon the *National Rejectors* case, quoting therefrom:

> " 'The law recognizes that employees may agree among themselves to compete with their then employer upon termination of their employment. Restatement, Agency (2d) § 393, comment e. Such employees are not limited merely to so agreeing during their employment with the employer with whom they intend to compete. They may plan and prepare for their competing enterprises while still employed. Keiser v. Walsh, 73 App.D.C. 167, 118 F.2d 13, 14. If such right is to be in any way meaningful for an employee not under contract for a definite term, it must be exercisable without the necessity of revealing the plans to the employer. See Midland-Ross Corporation v. Yokana, 3 Cir., 293 F.2d 411, 413 [3].' " 284 F.Supp. at 489.

In *National Rejectors*, the court found there was no attempt by the defendants to lure plaintiff's employees away. The Missouri Supreme Court stated that the evidence showed that the employees who left plaintiff company terminated their relationship for personal reasons. The court held: "The only inducement at all, shown by the evidence, was for

employment, and not to join a conspiracy." 409 S.W.2d at 34. As noted by the Missouri Supreme Court, we are dealing with two conflicting public policies. One policy seeks to protect a business from unfair competition. The other policy favors free competition in the economic sphere. The court explained:

> " 'It is necessary that there be a balancing of the equities between these two rights, for if the former is carried to its extreme it will deprive a man of his right to earn a living; while conversely, the latter right if unchecked, would probably make a mockery of the fiduciary concept, with its concomitants of loyalty and fair play.' Comment, The Obligation of a High-Level Employee to his Former Employer; The Standard Brands Case, 29 University of Chicago Law Review 339, 351–352. See Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430. In that case the court stated (160 A.2d 435): 'Were we to measure the sentiment of the law by both English and American decisions in order to determine whether it favors protecting a businessman from certain forms of competition or protecting an individual in his unrestricted pursuit of a livelihood, the balance would heavily favor the latter.' " 409 S.W. 2d at 39.

This court acknowledged in E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, (8 Cir. 1969), relying upon Iowa law, that employees are free to sever their relationship and enter into competition with their employer. Judge Bright said the employees "were entitled to resign * * * for a good reason, a bad reason, or no reason at all, and are entitled to pursue their chosen field of endeavor in direct competition [with their former employer] so long as there is no breach of a confidential relationship * * *." Id. at 1113.

We find no breach of duty of loyalty here. We think it clear under Missouri law, that absent convenant not to compete or breach of a confidential relation-

ship, an employee is free to leave his employment and enter into competition with his former employer.

Plaintiff's assertion of violations of Section 1 of the Sherman Act places reliance primarily on Perryton Wholesale, Inc. v. Pioneer Distr. Co., 353 F.2d 618 (10 Cir. 1965) and Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1 Cir. 1960). Both of these cases uphold Sherman Act violations where a competitor raids a competing company's key employees in order to gain confidential information and customers in a widespread territory. In *Perryton*, the court relied upon the dicta of Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 259, 38 S.Ct. 65, 62 L.Ed. 260 (1917), by saying:

> "In Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 259, 38 S.Ct. 65, 75, 62 L.Ed. 260, the Supreme Court said in substance that to persuade a 'rival's clerks to desert him under circumstances rendering it difficult or embarrassing for him to fill their places' was unfair competition. By its conspiratorial conduct Perryton successfully induced several trained and trusted employees of Pioneer to change sides in the competitive battle and to bring with them Pioneer's customers, routes, and business methods. As a result Pioneer lost business and was subjected to the troublesome burden of both shifting and training personnel to take the places of the deserters in an effort to maintain a competitive position. The record sustains the trial court's findings of conspiracy. The purpose and methods of the conspiracy exceed the bounds of fair competition." 353 F.2d 618, 621.

In the *Perryton* case the two competing companies were rack jobbers, which furnished merchandise to retail outlets on all types of non-food items. Pioneer was the predominant rack jobber in Western Kansas and Southeastern Colorado and had been engaged in the business for several years. In 1960, a key employee of Pioneer left the company and became Sales Manager with the new enterprise, Perryton Wholesale, Inc. Both before and after leaving, Perryton attempted to get other employees likewise to leave Pioneer. It was successful in getting several key salesmen, as well as Pioneer's Supervisor in Western Kansas and Colorado, to switch jobs. The evidence clearly showed that while still within its employ these departing employees called on Pioneer's customers and induced them to switch accounts. The court of appeals upheld both the grant of injunctive relief and the finding of damages.

In Atlantic Heel Co. v. Allied Heel Co., supra, the First Circuit upheld a complaint framed under the Sherman Act which alleged raiding of key employees by a competing company dealing in leather heels. Charged in the complaint, *inter alia*, was (1) that the defendant had induced the superintendent and other key employees to leave plaintiff and work for defendant, (2) that confidential trade secrets had been improperly obtained, (3) that plaintiff's product and its financial condition had been falsely disparaged by the defendant, (4) that salesmen were induced to quit and bring with them valuable customers and (5) that defendant had interfered with plaintiff's source of supplies with intent to force cancellation of plaintiff's orders.

█ We agree with plaintiff that resolution of the Sherman Act issue here does not turn upon the fact that in the above cases the raid of a competitor's key employees was made by *an established concern* with the intent to disrupt and ruin competitive standing. An established position in the market is not the *sine qua non* to a suit for wrongful restraint of trade under the Sherman Act. A Section 1 violation of the Sherman Act requires merely a finding of unreasonable restraint on interstate commerce. United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Apex Hosiery Co. v.

Leader, 310 U.S. 469, 485, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); Perryton Wholesale, Inc. v. Pioneer Distr. Co., 353 F.2d 618, 622 (10 Cir. 1965).

■ The resolution of the issue in *National Rejectors*, of course, does not answer plaintiff's contention under the Sherman Act. The common law of Missouri cannot control a federal question. As seen by the analyses of cases discussed, there exists a distinct body of law governing the right of individual employees to terminate their employment and enter into fair competition as contrasted with the law forbidding former employees conspiring to induce others to quit their employer for the express purpose of eliminating their former employer as a competitor. *National Rejectors* embodies the first rule, *Perryton*, the second. The two rules are not inconsistent, but sometimes the line of demarcation is difficult to appraise. Cf. Restatement of Agency (2d) § 393, comment e.

■ In the instant case, the trial court found on the evidence submitted that there existed no conspiracy to eliminate plaintiff unfairly from competition in the St. Louis area. This finding is not clearly erroneous.

It is true the mass exodus of the employees casts suspicions that Wachter and Fleschner or Wachter alone may have conspired with the others to ruin the competitive position of plaintiff company. Cf. Frederick Chusid & Co. v. Marshall Leeman & Co., 279 F.Supp. 913 (S.D.N.Y.1968). However, noteworthy in appraising the present evidence is the total absence of (1) soliciting of plaintiff's customers to switch allegiance to the new company while the defendants were still in the employ of plaintiff, (2) wrongfully disparaging plaintiff or plaintiff's products and (3) hiring of employees to obtain confidential information or trade secrets. In addition, it is significant that Wachter's intentions were all open and above board. Plaintiff was given sixty days notice of his intentions to resign. Wachter did not need to hire any of plaintiff's personnel to acquire trade secrets or knowledge of business policies or potential users of lubricating oils. He could not help knowing the plaintiff's business practices from his own experiences.

Furthermore, the plaintiff company was alerted to the intentions of the other employees to remain with Wachter in his new enterprise, whether it was to be as an exclusive distributor, jobber or direct competitor. Plaintiff's officers interviewed all St. Louis employees with the exception of one secretary. Each employee was given and made a deliberate choice of remaining or leaving. They were certainly free to make their own decision. Plaintiff even offered Fleschner the job of Division Manager in anticipation of Wachter's resignation. He chose to go into the new business. Plaintiff knew that the three part-time girls came with Wachter. Plaintiff also had earlier asked Wachter to terminate their services since it was felt they were no longer needed in view of hiring Weston, a full-time Administrative Assistant. The evidence shows that both Weston and Kohl had been with plaintiff only one year. Weston was earlier offered a job to go to Chicago with plaintiff but he elected to stay in St. Louis, primarily because of his wife having other employment there. Plaintiff admitted that a salesman was of little value to the company until he had served two years' apprenticeship.

The claimed immediate embarrassment and inconvenience of plaintiff by losing these employees was brought about in some measure by plaintiff's own action. Instead of attempting to find replacements for these employees who openly disclosed their early intentions to go with the new enterprise, plaintiff did nothing beyond securing a replacement for Wachter. Yet it had over sixty days notice that Wachter and the other employees would leave. The mere fact that defendants decide to leave

their employ and enter into competition with their employer is by itself not sufficient evidence to establish unfair and inequitable dealings so as to sustain a claim of unfair competition under the Sherman Act. We sustain the denial of the preliminary and permanent injunctions sought.

Judgment affirmed.