BBF, Inc. *vs.* Germanium Power Devices
Corporation & others.[1]

Middlesex.    December 17, 1981. — February 5, 1982.

Present: Hale, C.J., Cutter, & Rose, JJ.

*Corporation,* Officers and agents, Corporate opportunity. *Damages,*
Wrongful appropriation of corporate opportunity. *Pleading, Civil,*
Amendment.

In an action by a corporation seeking damages based upon the alleged im-
proper use by four defendants of information acquired in confidence
by two of the defendants, while employed by the corporation, to ac-
quire for themselves a competitor's assets which were being sought by
the corporation, the trial judge was justified, in the circumstances, in
concluding that the defendants had appropriated a corporate opportu-
nity belonging to the corporation and were jointly and severally liable
for injuries to the corporation proximately caused by their actions.
[171-172]

In an action by a corporation seeking damages against four defendants
based upon their alleged improper use of a corporate opportunity be-
longing to the corporation to acquire a competitor's assets, where one
of the defendants, while still a trusted employee of the corporation,
persuaded two fellow employees, whose employment was terminable
at will, to leave their employment and associate themselves with the
newly acquired corporation, the trial judge was justified in finding the
defendants liable for injuries proximately caused by the violation of a
duty of loyalty in connection with what the judge regarded as essen-
tially a conspiracy allowing the defendants to take advantage of the
breach of the duty of loyalty to the corporation.  [172-173]

In an action by a corporation seeking damages based upon the alleged im-
proper use of a corporate opportunity by former employees to acquire
a competitor's assets, the trial judge's award of damages was adequate
in light of her findings indicating that the corporation had not estab-
lished by evidence either that, as to some issues, the defendants'
behavior was the proximate cause of any damage to the corporation,
or that, in those areas where some harm to the corporation was shown,
such harm had a reasonably ascertainable monetary value.  [174-177]

[1] Francis B. Driscoll, John Q. Adams, Jr., and Mr. Oliver O. Ward.

In an action by a corporation seeking damages based upon the alleged im-
proper use of a corporate opportunity by former employees to acquire
a competitor's assets, the trial judge, in determining that the corpora-
tion was entitled to recover the salaries paid to its employees during
their period of disloyalty, did not abuse her discretion by disallowing
the defendants a credit for the fair value, if any, of their services to the
corporation during this period. [177]

In an action commenced in 1974 by a corporation seeking damages based
upon the alleged improper use of a corporate opportunity, the trial
judge did not abuse her discretion in refusing to allow the corporation
to amend its complaint in 1980 to include prayers for relief under
G. L. c. 93A, § 2(a), on the grounds that the motion was "not timely
filed," and that the defendants would be prejudiced by not having had
an opportunity to make an offer of settlement. [177-178]


BILL IN EQUITY filed in the Superior Court on January 14,
1974.

The suit was heard by *Porada*, J., a District Court judge
sitting under statutory authority.

*Allan van Gestel* (*Joan I. Milstein* with him) for the plain-
tiff.

*Robert T. Gill* (*Dale A. Coggins* with him) for the de-
fendants.

CUTTER, J.  BBF Group, Inc.[2] (BBF), in December, 1972,
acquired by merger all the assets of Silicon Transistor Cor-
poration (Silicon) which was engaged in the manufacture
and sale of silicon and germanium transistors.[3]  Since the
merger, Silicon has continued this operation as a division of

---

[2] The original plaintiff, BBF Group, Inc., and its successor, BBF, Inc.,
which in 1976 acquired certain assets of the former (including this cause
of action), are each referred to as BBF.

[3] The trial judge found that germanium is a chemical element which is
cut into small pieces for insertion in transistors which are electronic
devices.  The devices are assembled, various components are etched, run
through a furnace and re-etched, and wires are attached to the device.
The germanium transistors made by BBF are similar to those made by its
competitors and since 1960 there has been throughout the industry no sig-
nificant change in the method of constructing such devices.  At present
transistors are largely made from silicon which has various advantages
over germanium.  The market for germanium transistors is shrinking and
is generally limited to their replacement in older equipment.

BBF. Francis B. Driscoll, a defendant, was general manager of the operation from the date of BBF's acquisition of the Silicon division until his resignation in 1973. The defendant John Q. Adams, Jr., during the same period was the division's marketing manager. Mr. Oliver O. Ward, an attorney, also a defendant, had known the other individual defendants for some time, but had no connection with BBF or with Silicon.

Solitron Corporation (Solitron), a competitor of BBF, also made silicon and germanium transistors. In 1973, its then president, Ben Friedman, told James France of BBF that Solitron was interested in selling its germanium operation, a matter not then of public knowledge. In March, 1973, Friedman met with France, Driscoll, Adams, and Boruch B. Frusztajer, chief executive officer of BBF, to discuss the sale for $350,000 of Solitron's germanium operation, including equipment, piece parts, inventory, and customer lists. The BBF representatives decided to investigate the operation including an on-site inspection of Solitron's plant at Riviera Beach, Florida. Driscoll, chosen to investigate,[4] recommended in his first report the purchase of the Solitron germanium operation. In his second report, he recommended the purchase only if there should be further negotiations.[5]

A meeting of the BBF representatives on May 22 was attended by France, Frusztajer (who had the power to make the final decision), Adams, and Driscoll. Frusztajer decided that, although "the acquisition of Solitron's assets would be beneficial, . . . he did not think Solitron could sell its germanium operations to anyone other than . . . [BBF] and

[4] He submitted two reports. Solitron did not want its employees to know of the negotiations and at first would agree to allow only one BBF employee to visit its plant — and then after hours.

[5] During a visit on April 14, 1973, to the Solitron plant in Florida, Driscoll made a tour of the plant with John Tiller, the manager of Solitron's germanium products division, and also met Dick Trevison, Solitron's vice-president and general manager. On May 10, 1973, Driscoll learned that Tiller was resigning and that the Solitron germanium operation was being closed. Driscoll was offered Tiller's job but refused it.

[that] if BBF . . . bided its time Solitron would come back with a more attractive offer."

In July, 1973, Driscoll spoke to Mr. Ward about the possibility that they form their own germanium business. Late in September or in October, 1973, Mr. Ward spoke to Trevison (see note 5) at Solitron about buying Solitron's germanium assets. On October 6, November 6, and November 15, Driscoll alone, or with Adams or Mr. Ward, visited the Solitron plant. Neither Adams nor Driscoll disclosed to BBF either these visits or that they were interested in acquiring any part of Solitron's germanium assets for themselves.

Trevison of Solitron called France of BBF on October 26, 1973, to tell him that "any part of . . . [Solitron's] germanium operations was now for sale." France directed Driscoll to investigate the offer. Driscoll did not follow through on France's request or divulge the interest he and his associates had in acquiring Solitron's assets for themselves. On November 7, 1973, France learned by a telephone call to Solitron that some BBF employees were visiting the Florida plant "on their own." France then met with Driscoll and Mr. Ward on November 13, 1973, and discussed Driscoll's resignation from BBF. France did not want Driscoll to return to BBF, but his resignation was made effective on November 21, 1973, to enable Driscoll to have some vacation that was due to him.

Germanium Power Devices Corporation (Germanium) was incorporated by Mr. Ward in Delaware on November 1, 1973, and was qualified to do business in Massachusetts. Mr. Ward became its president and a director at once upon its incorporation. In its behalf, Driscoll and Mr. Ward purchased for $200,000 from Solitron a part of its germanium assets including certain equipment, piece parts, and inventory. They bought no customer lists. By then Solitron had ceased to conduct germanium operations. By the time of the purchase on November 15, Driscoll had ceased to work for BBF but was still carried as a BBF employee until November 21, because of the unused vacation time.

Driscoll started work with Germanium on November 19, 1973, as its production and plant manager. He acquired eleven percent of its stock. Adams resigned from BBF on November 13 and began work as Germanium's vice-president in charge of marketing. While Driscoll was still an employee of BBF in October, 1973, he approached William J. Dawson who was then BBF's maintenance manager for its germanium operations. He put Dawson in touch with Mr. Ward and on November 6, 1973, Dawson went with Driscoll to Solitron's Florida plant. Dawson resigned from BBF on November 13, 1973, and went to work for Germanium on the same day. Driscoll also approached Peter J. Ulaskiewicz about joining the new venture. Ulaskiewicz was BBF's "manager of the front end of the germanium production line," charged with adjusting the ovens to suit particular germanium material and customer specification. Ulaskiewicz resigned from BBF and went to work for Germanium on November 12, 1973.

On November 3, 1973, BBF had twenty-six production employees and about twenty-five more in various related operations. By January 18, 1974, eleven of these BBF employees had become employees of Germanium.[6]

On January 14, 1974, this complaint was filed by BBF (in its then corporate form, see note 2, *supra*) seeking relief against Germanium, Driscoll, Adams, and Mr. Ward based upon the alleged improper use by these four defendants of a corporate opportunity belonging to BBF in their acquisition of assets of Solitron and damages for injuries alleged to have been caused by the breach of the duty of loyalty owed by Driscoll and Adams to BBF and by their inducing various employees of BBF to go to work for Germanium.

The evidence was not included in the record appendix. A District Court judge, sitting in the Superior Court by statutory authority, made extended findings (on which the fore-

---

[6] The trial judge found that BBF failed to establish that any of the defendants attempted to induce or induced BBF's employees (other than Dawson and Ulaskiewicz) to leave BBF to work for Germanium.

going statement of the case is based) and an order for judgment for BBF of $6,004.93 with interest and costs. From the judgment the plaintiff appeals, principally on issues affecting damages, but also from the denial of BBF's motion, filed April 7, 1980, to amend the complaint to add an additional prayer for relief under G. L. c. 93A, § 2(a), seeking a determination that Germanium's conduct constitutes a wilful and knowing violation of that section entitling BBF to double or treble damages. This motion the judge denied. The defendants jointly appeal from the judgment. Further facts, based on the judge's findings, are stated below in connection with the discussion of issues to which they are pertinent.

1. The trial judge reached the following conclusion concerning the defendants' appropriation of a corporate opportunity owned by BBF. Driscoll and Adams owed a duty of loyalty to BBF at all times in 1973 relevant to this action. They acted unfairly toward BBF in making use of information, acquired by them in confidence, concerning the opportunity to acquire Solitron's assets. Driscoll, a BBF employee who knew that BBF remained interested in acquiring Solitron's germanium assets, discussed with Mr. Ward in July or August, 1973, the possibility of forming a new germanium company. As a consequence, Mr. Ward made various visits to the Solitron plant. Driscoll went with Dawson to the Solitron plant, participated with Mr. Ward in negotiating the purchase of part of Solitron's assets, and helped Adams and Mr. Ward to select a site for Germanium's new plant. He did not comply with France's order to investigate Solitron's revised offer of October 26, 1973. He also approached Dawson and Ulaskiewicz about working for the new corporation. Adams knew that Germanium's acquisition of Solitron's assets would be harmful to BBF. He violated his duty of loyalty by using confidential information and helping to select the new plant site. Mr. Ward knew or should have known of Driscoll's and Adams's duty of loyalty to BBF. Nevertheless, he participated with them in acquiring for Germanium some Solitron assets.

On these subsidiary facts, the judge was justified in concluding that the three individual defendants and Germanium had appropriated a corporate opportunity of BBF. Accordingly, she reasonably decided that the defendants were jointly and severally subject to liability for injuries to BBF proximately caused by their actions. See *American Circular Loom Co.* v. *Wilson*, 198 Mass. 182, 206 (1908); *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198-199 (1948); *Weismann* v. *Snyder*, 338 Mass. 502, 504-505 (1959). See also *Woolley's Laundry, Inc.* v. *Silva*, 304 Mass. 383, 386-387 (1939); *Production Machine Co.* v. *Howe*, 327 Mass. 372, 377-379 (1951); *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 839-841 (1972). Compare *Black* v. *Parker Mfg. Co.*, 329 Mass. 105, 111-114 (1952).

The defendants contend that the Solitron offer ceased to be a confidential corporate opportunity in the autumn of 1973 when it became public knowledge that Solitron's assets were for sale. Even before that time, however, Driscoll and Adams for their own advantage had begun to use information which came to them in confidence as trusted BBF employees. Indeed, Driscoll, at the expense of BBF, had investigated the opportunity to acquire Solitron's assets and had formed the opinion that BBF in its own interest should acquire these assets or some of them. When the availability of Solitron's assets became public, he and his associates were ready to move. The defendants also place some emphasis on the fact that the assets acquired by Germanium from Solitron represented only part of the assets offered to BBF by Solitron and were "readily available from industrial suppliers." Whatever bearing these circumstances may have had on issues of causation and of the extent of damages, the judge was not required to conclude that they, by themselves, necessarily operated to relieve the defendants of liability for their misuse of Driscoll's and Adams's confidential knowledge of BBF"s corporate opportunity.

2. A somewhat more difficult problem is presented by the judge's conclusion that the defendants are subject to liability because Driscoll, while still a trusted employee of BBF,

approached Dawson and Ulaskiewicz on the defendants' behalf. The trial judge found that, except for wages paid, there was no evidence concerning the terms of employment by BBF of Dawson and Ulaskiewicz. She, therefore, reasonably assumed that their employment was terminable at will. As the defendants contend, an employer, at least in the absence of the use of "wrongful means," ordinarily may hire such an employee (at will) of another employer without becoming subject to liability to the earlier employer. Restatement (Second) of Torts § 768, Comment (i) (1979). These defendants' conduct could be found to have been "wrongful," however, because done in connection with, and as part of, what the trial judge regarded as essentially a conspiracy allowing the defendants to take advantage of Driscoll's and Adams's breach of their duty of loyalty to BBF. See *Barden Cream & Milk Co.* v. *Mooney,* 305 Mass. 545, 546-547 (1940); *New England Overall Co.* v. *Woltmann,* 343 Mass. 69, 75-78 (1961); Restatement (Second) of Agency § 393, Comment (e), §§ 395-396 (1958).

This area of the law is one where, as the Restatement at § 393, Comment (e), points out, the "limits of proper conduct with reference to securing the services of fellow employees are not well marked." Much depends obviously upon the facts of the particular situation. Any liability incurred, however, gives rise only to responsibility for injuries shown to have been caused proximately by the violation of the duty of loyalty and only for damages proved with adequate certainty. Compare *Metal Lubricants Co.* v. *Engineered Lubricants Co.,* 411 F.2d 426, 429-432 (8th Cir. 1969); *United Aircraft Corp.* v. *Boreen,* 413 F.2d 694, 698-700 (3d Cir. 1969); *Sarkes Tarzian, Inc.* v. *Audio Devices, Inc.,* 166 F. Supp. 250, 266-268 (S.D. Cal. 1958), aff'd per curiam, 283 F.2d 695 (9th Cir. 1960), cert. denied, 365 U.S. 869 (1961). *Cudahy Co.* v. *American Labs., Inc.,* 313 F. Supp. 1339, 1346-1348 (D. Neb. 1970); *Motorola, Inc.* v. *Fairchild Camera & Instrument Corp.,* 366 F. Supp. 1173, 1179-1182 (D. Ariz. 1973)

3. BBF contends that in various respects the trial judge failed to award adequate damages for the wrongful use by Germanium of Driscoll's and Adams's knowledge of BBF's corporate opportunity. To test these contentions it is important to determine precisely what facts the trial judge found, and what conclusions she reached, with respect to (a) Germanium's use of that opportunity and (b) the evidence she regarded as submitted to her concerning the consequences of that use. The judge's findings and conclusions are summarized below (although with variations in order from that used by her).

(1) When Germanium purchased some of Solitron's assets, Solitron already had suspended operations and "was not conducting an ongoing germanium business." Germanium did not buy a going business.

(2) Germanium purchased only certain Solitron assets, viz. equipment ("readily available from industrial suppliers"), "piece parts, and inventory."[7] No evidence was produced as to the fair market value of these items (as compared to what Germanium paid for them) or as to how the purchase "of these assets alone would have affected . . . [BBF's] profit capability."

(3) Germanium "did not misappropriate any trade secrets or customer lists" or sales data, which might have been used for any period of time in realizing profits. Cf. *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. 159, 168-185 (1979); *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.,* 381 Mass. 1, 11-12 (1980), which reveal the special judicial concern felt for the adequate protection of trade secrets.

(4) There was no evidence that Adams tried to communicate with BBF's customers in violation of his duty as a BBF employee, or that Germanium made sales to BBF's custom-

---

[7] The judge's findings do not show that BBF after 1973 ever bought any assets comparable to the Solitron assets or had to pay more than Germanium paid for any such assets, or that the Solitron assets were unique in any way.

ers or to potential customers of BBF which would have been made by BBF except for the defendants' tortious acts.

(5) The Solitron equipment purchased by Germanium was delivered in late December, 1973, or in early January, 1974. Germanium began "making germanium devices" in January, 1974, and is still in that business.

(6) BBF failed to produce evidence that its 1974 decline in gross profits was caused by the defendants' sales to BBF's customers or by the defendants' wrongful conduct. The 1974 decline could be accounted for by the shrinking market, competitive pricing, or the quality (or lack of it) of BBF's products as well as by Germanium's entry into the germanium field which by 1980 had been reduced to three concerns (including BBF and Germanium) as compared with six in 1973 before Germanium became a competitor.

(7) "No evidence was introduced . . . of the profits, gross or net," of Germanium from its inception in 1973 to the trial in 1980. The judge concluded that BBF failed to prove that the defendants realized any profits from Germanium's appropriation of BBF's corporate opportunity or from its use of confidential information, or from the wrongful hiring of Dawson and Ulaskiewicz, or that the defendants (apart from salaries paid to Driscoll and Adams during their period of disloyalty) thereby "were unjustly enriched."

(8) There was no evidence of the net profits of BBF or its Silicon Division for the years 1973 to the date of trial. The judge referred, however, to evidence introduced by BBF of somewhat complicated accounting figures of the operations of BBF's Silicon Division from and after 1973. These figures, if believed, would establish that in 1974 BBF experienced an unfavorable variation from its expected standard costs for germanium devices. The trial judge accepted the position that BBF "in 1974 did suffer a decline in yield [see note 8, infra] in the number of germanium devices produced" but rejected the view that this amounted to the sum of $134,000, suggested by the accounting figures as the difference between BBF's 1974 "standard" costs and its actual costs, or that the figures represented "the dollar value of the

decline in yield" or the "lost profits" of BBF "as a result of the defendants' acts." The judge concluded that BBF failed to prove that it "lost any profits as a result of the tortious acts of the defendants."

(9) BBF did not produce evidence of the cost of training or finding replacements for Dawson and Ulaskiewicz. They were immediately replaced by other employees. There is insufficient evidence to enable a reasonable approximation in dollars of any profits or production lost by BBF because of the departure of these two employees[8] as distinguished from profits lost from the departure of other BBF employees (see note 6, *supra*) for whose transfers the defendants were not responsible.[9]

The aggregate findings just summarized show that there was firm basis for the judge's conclusions. BBF had not established by evidence either (a) that, as to some issues, Germanium's behavior was the proximate cause of any damage to BBF, or (b) that, in those areas where some harm to BBF was shown, such harm had a reasonably ascertainable mon-

---

[8] The judge recognized to some extent the importance of employees such as Dawson and Ulaskiewicz by her finding (numbered 40) that, although many of the normal aspects of the manufacture of germanium transistors (see note 3, *supra*) required slight earlier experience and only several hours training, various "basic adjustments in the process . . . determine the quality and utility of the finished product." These adjustments "are important in producing a good 'yield' which is defined as the number of pellets of germanium which are successfully created into a product compared to the number put through the furnace." These basic adjustments can be made by a person with several hours' training with the help of "cook book" data indicating what adjustments must be made to create particular results, but "[m]anufacturing germanium devices with a high yield is an art someone learns from experience."

[9] The only evidence of Solitron's sales from its germanium operations was that obtained from Driscoll's reports (see note 4, *supra*) which were estimates "of projected sales and profits based [a] upon conversations with two representatives of Solitron" (without examination of Solitron's records) and (b) on the then proposed acquisition by BBF of all of Solitron's "ongoing germanium operation" and not merely the material in fact bought by Germanium. This evidence the trial judge reasonably rejected as "speculative, conjectural, and inappropriate," and obviously gave it no significant weight in determining the damages of BBF on any aspect of this litigation.

etary value.   On this record, we are not in a position to say that her determination was clearly erroneous.

The trial judge recognized that under the Massachusetts cases "an element of uncertainty is permissible in estimating damages and the award of damages is permissible on meager evidence, in particular in business torts where the focus is on the wrongfulness of [the] defendants' conduct."   See *H.D. Watts Co.* v. *American Bond & Mortgage Co.*, 267 Mass. 541, 551-554 (1929);[10]  *Carlo Bianchi & Co.* v. *Builders' Equip. & Supplies Co.*, 347 Mass. 636, 645-646 (1964); *Rombola* v. *Cosindas*, 351 Mass. 382, 385 (1966); *National Merchandising Corp.* v. *Leyden*, 370 Mass. 425, 430-434 (1976); *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 168-181 (1979, but see *S.C.*, 361 Mass. 835, 843-845 [1972]).   See also *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. 603, 607-610 (1961).   Compare *White Spot Constr. Corp.* v. *Jet Spray Cooler, Inc.*, 344 Mass. 632, 635-636 (1962).   Nevertheless, the judge's findings show that the evidence presented before her as trier of the fact did not persuade her.   She obviously took the view that BBF had not proved damages with even minimal certainty.

4.   The trial judge reasonably determined that BBF was entitled to recover the salaries paid to Driscoll and to Adams during their period of disloyalty which she found for Driscoll ran from October 6 to November 21, 1973, and for Adams from October 6, 1973, to November 13, 1973.   It may be that the judge could have allowed these defendants a credit for the fair value, if any, of their services to BBF during this period (see e.g. *Sagalyn* v. *Meekins, Packard & Wheat Inc.*, 290 Mass. 434, 439-440 [1935]), but we cannot say that the judge abused her discretion by disallowing all salary paid by BBF to these defendants during the pertinent period.   *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 379 (1951).

5.   The judge also did not act beyond the limits of a sound discretion in refusing on May 16, 1980, to allow BBF to

---

[10] For related cases, see 260 Mass. 599 (1927) and 272 Mass. 84 (1930).

amend its complaint to include prayers for relief under G. L. c. 93A, § 2(*a*). The grounds for denial were stated as being that the motion (filed April 7, 1980) was "not timely filed," and that the defendants "would be prejudiced by not having had an opportunity to make an offer of settlement." These grounds suggest that trial of this case (commenced in 1974 and thus pending in 1980 for over six years) was then imminent. We do not have before us the facts before the trial judge when the motion was heard. Introduction of a new cause of action, different in substance and theory in various respects from the original cause of action, at this stage of the case reasonably might have been deemed grossly unfair to the defendants. See *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 291-293 (1977). See also *Commonwealth* v. *DeCotis*, 366 Mass. 234, 244 n.8 (1974); *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975); *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 78-79 (1977). Compare *Wolfe* v. *Ford Motor Co.*, 6 Mass. App. Ct. 346, 353-355 (1978).

6. Our decision makes it now unnecessary to consider whether the defendants' motion to strike certain evidence, originally admitted de bene, should be allowed.

*Judgment affirmed.*