Nickerson, Gary A., J.
This is an action for legal fees on a contingent fee agreement. The case was tried, jury waived, on March 31, April 1 and 8, 2004. On August 11, 2004, the court entered its Findings of Fact, Rulings of Law, and Order for Judgment. The decision prompted both sides to file motions to amend the judgment. After further review of the evidence and consideration of the competing motions, the court vacates the decision of August 11th and any judgment entered thereon. Based on all the credible evidence the court enters the following findings of fact.
FINDINGS OF FACT
The Plaintiff, Griffith & Associates, PLLC, is a New Hampshire professional limited liability company which is the business entity encompassing the law practice of John Griffith. Griffith is a trial lawyer of considerable experience. He has been a member of the New Hampshire bar since 1966 and more recently was admitted to practice in Massachusetts in 1998. His early years in the practice were spent defending and prosecuting tort actions. From 1971 through 1998, he was a member of the Nashua, New Hampshire firm of Hamblett & Kerrigan. From 1998 to the present he has concentrated on trial work under the name of the plaintiff. As the years progressed, his emphasis shifted from tort to business litigation.
The Defendant, Malouf, Inc., is a New Hampshire corporation based in Nashua which does business under the name of LMA. LMA is engaged in personal management consulting, in particular organizing and presenting business training programs aimed at mid-level managers in large corporations and government entities. LMA’s client roster includes the names of several Fortune 500 companies such as Procter & Gamble. LMA was founded in 1975 by Leroy Malouf. From its inception, the company had a close relationship with Situation Management Systems, Inc. (SMS), a Massachusetts-based firm which produced business training materials. LMA was a major distributor of SMS’s products through the 1980s. During the mid-1990s, Leroy Malouf passed the active management of LMA on to his three children, with his daughter Shari Malouf taking the lead role as president of the defendant corporation.
Late in 1989, LMA had the opportunity to purchase The Kasten Company, a firm similar to LMA which distributed SMS’s products in the mid-Atlantic states. LMA’s leaders met with those from SMS to be sure that if LMA bought Kasten, LMA would have the right to distribute SMS products in the traditional Kasten territory for a period of five years. Historically, LMA and SMS operated under a two- or three-year distributorship contract. LMA received SMS’s agreement and proceeded to buy Kasten. Within months, SMS re *613 neged, leaving LMA to suffer the loss of the price it paid for Kasten and anticipated lost profits totaling $3,800,000.
While LMA was in a business tailspin due to SMS’s breach of contract, SMS sued LMA in Plymouth Superior Court claiming LMA owed SMS some $80,000 for product delivered. LMA counterclaimed for damages on the breach of contract.
At the start of the litigation in 1993, LMA had counsel other than Griffith. Leroy Malouf, although caught in a cash-flow bind, was a shrewd businessman. He wanted an experienced business litigator on board. The senior Malouf approached Griffith in May 1995, asking that he take the case on a contingent fee basis. Griffith took a retainer of $2500 to cover his time evaluating the file. The problems with the case were obvious to Griffith. LMA was slipping from being a successful to being a marginal business. The five-year distributorship agreement was at best an oral contract in contrast to a long history of prior written contracts between LMA and SMS. There was a great deal of variance in the recall amongst the witnesses. The statute of frauds and promissory estoppel loomed as issues. The case was proceeding in a court south of Boston. Griffith consulted his partners at Hamblett & Kerrigan. On behalf of his firm, Griffith drafted a contingent fee agreement which Sherri Malouf signed on behalf of LMA (ex. 11). The agreement was the product of their negotiations, reflecting an incentive for an early resolution of the case. Griffith’s assumption of the LMA case precluded him from accepting at least four or five other significant cases.
Griffith took the case to victory. A Plymouth County jury awarded LMA $3,800,000 on July 23, 1997. With interest, the judgment was about $5,900,000. SMS appealed. The Supreme Judicial Court affirmed the judgment. Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875 (2000). By all accounts, Griffith performed brilliantly at trial and held the line on appeal. Under the fee agreement Griffith had earned the right to 37% of any recovery.
But for LMA’s judgment, SMS was a going concern in 1997. For several years it had posted healthy profits on gross sales in excess of $3,000,000. Other than LMA, SMS’s creditors were few and quite manageable. Griffith, on behalf of LMA, sought an agreement with SMS for the payment of the judgment over time. The parties engaged in mediation but in the end SMS tendered a mere $150,000 for full satisfaction of the judgment. LMA rejected the offer. SMS filed with the Bankruptcy Court for Chapter 11 protection on October 31, 1997.
Griffith was never a bankruptcy lawyer. Members of his firm who were familiar with such matters thought it was best handled by a specialist closer to Boston. Griffith met with Sherri Malouf during the first week of November 1997 and recommended the services of Attorney Thomas Raftery of Carlisle, Massachusetts. Ms. Malouf agreed. Griffith and Malouf never discussed whether Rafteiy was to be paid under the “employment of addition counsel” clause of the contingent fee agreement. Rafteiy went to work, billing LMA on an hourly basis. All tolled his fees were $30,000, paid by LMA.
In May 1998, Griffith left the firm of Hamblett & Kerrigan. On May 8th, he wrote to Sherri Malouf to say he was entering an appearance in the bankruptcy case “so that I can keep up to date directly with what is happening.” (Ex. 2.) His letter went on to state that he needed a new contingent fee agreement directly with LMA. Griffith agreed to pay Hamblett & Kerrigan from any recoveiy due Griffith. Griffith asked Malouf to countersign the letter of the 8th if LMA was in accord. This she did. By May 8th, it was clear to Griffith and Ms. Malouf that the only recoveiy from SMS would come though the efforts of Raftery in the bankruptcy proceedings. Moreover, by May 8th, Ms. Malouf had set in her mind the goal of LMA owning SMS.
Raftery took control of the bankruptcy case. Early on, Griffith consulted with Raftery and stood ready to assist. Ms. Malouf and Griffith remained on cordial terms past the entry of the Supreme Judicial Court’s decision in March 2000. Raftery formulated a proposal whereby the Bankruptcy Court would force an auction of SMS. Raftery, Griffith and Ms. Malouf planned for LMA’s take over of SMS. This prompted some talk between Griffith and Ms. Malouf as to how Griffith would be paid for his services. The two discussed the possibility of Griffith acquiring an interest in SMS, a 37% interest based on the 37% due Griffith on a recoveiy under the contingent fee agreement. No agreement was reached in this regard. No one in the Malouf family had any intention of sharing the ownership of SMS or LMA with an outsider. In October of 2000, Griffith, Sherri Malouf and Richard Malouf, Sherri’s brother and the chief financial officer of LMA, met. They discussed the fact that a takeover of SMS could generate significant future cash flow. Sherri Malouf said the cash could be used to buy out Leroy Malouf s interest in LMA. Griffith protested, saying he should be paid from any cash realized. Sherri Malouf told Griffith he’d be paid by collecting SMS’s European accounts receivable. This precipitated a parting of the ways. On November 28th, Griffith wrote to Ms. Malouf suggesting that LMA seek counsel on the issue of Griffith’s fees.
Rafteiy succeeded in having the Bankruptcy Court order the auction of SMS early in 2001. The then president of SMS, Alexander Moore, and LMA were the sole bidders, with LMA prevailing at $877,000 over Moore’s bid of $600,000. Under the terms of the Bankruptcy Court’s approved plan, the winning bidder was required to post the purchase price. LMA did so, borrowing the initial auction deposit of $50,000 from a bank and the remaining $827,000 from Leroy Malouf. Leroy Malouf loaned $827,000 to LMA, know *614 ing full well that LMA owed legal fees to Griffith.[1] At the time of the auction, SMS had cash reserves in excess of $400,000. From the combined cash reserves of SMS and the bid price, the court plan dictated that the bulk of the lesser creditors’ claims be paid and that LMA be paid in part on its claim. The plan also called for a stream of payments to be made by SMS over 48 months with the end result that the lesser creditors be paid in full and that LMA receive 48 additional partial payments.
When the accounting was done, LMA received on May 31, 2001, acashpayment of $1,207,638.30[2] plus the promise of monthly payments of $14,212.23 for 48 months. As the winning bidder, LMA gained full ownership of the reconstituted SMS. In the ensuing months, SMS made 13 monthly payments of $14,212.23 to LMA. SMS paid the lesser creditors in full. Thereafter, the payments ceased due to the fact that the lines of distinction between LMA and SMS dissolved as Sherri Malouf turned her full attention to running SMS. As a practical matter, the two companies were run as one, in part to reduce operating costs, but also in an effort to avoid paying Griffith’s fees.
On April 10, 2001, Griffith wrote to LMA demanding 37% of the initial payment and 37% of all future disbursements from SMS. LMA had other uses for the funds. The $877,000 in loans were promptly repaid, $50,000 to the bank and $827,000 to Leroy Malouf. The senior Malouf allegedly returned the $827,000 to his pension account, a fund administered by Tredegar Trust, a reach and apply defendant in this action. Other debts of LMA were paid. Sherri Malouf seized upon the influx of capital as her opportunity to grow the combined companies. Sherri, Leroy, Richard and Sherri’s sister Cynthia, who works as the sales manager, were paid handsome salaries, a practice that continues today. From April 2001 on LMA denied it owed Griffith anything, saying he had failed to recover any sums from SMS and thus was due nothing.[3] LMA failed to note even a contingent liability as to Griffith on its balance sheets.
Griffith filed the present action on June 13, 2001. One week later, the court, McLaughlin, J., issued a preliminary injunction requiring LMA to escrow the periodic payments received from SMS. In October 2001, Justice Chin granted attachments against Leroy Malouf and Tredegar Trust in the sum of $440,000. Griffith now seeks damages under the contract and, failing that, a recovery in quantum meruit. He also has a claim for Chapter 93A, Section 11 damages. LMA counterclaimed, amorphously alleging damages and seeking declaratory relief. LMA did not press its counterclaim at trial.
Throughout the saga Griffith kept track of his professional time. The hours logged on the books of Hamblett & Kerrigan do not tell the full story for Griffith’s court days are under reported. All tolled, he devoted 1,000 hours to LMA’s interests, exclusive of any time in the bankruptcy action. The court credits the expert testimony of Attorney Charles Bennett and finds Griffith’s time in this matter was worth $350 per hour. Moreover, the associates at Hamblett & Kerrigan devoted 335 hours to the task at an average rate of $120 per hour.
No expert opined at trial as to the worth of SMS. There is an admission by LMA in bank financing documents that SMS was worth between $1,500,000 and $2,000,000 (ex. 44). Moore bid $600,000 at the auction, a low bid, no doubt calculated to meet his dual goals of retaining control of SMS and crunching down the cost of relieving SMS of its debt to LMA. SMS had a history of annual sales in excess of $3,000,000 on products that produced a high profit margin. Richard Malouf testified that at the close of fiscal year 2001, SMS had a net worth of $518,000 and that the plan’s immediate cash payouts and future cash payouts were booked in fiscal year 2001. Adding those payouts to the net worth figure brings one to a round number of $2,400,000. This court cannot precisely set the value of SMS, on the eve of the auction (sans the LMA debt), based on the testimony to date, but the court can confidently say the value exceeded $2,500,000.
APPLICATION OF THE FACTS TO THE LAW
Contingent fee agreements have been recognized as a valued and vital resource which enable plaintiffs with meritorious causes of action, but who lack funds to pay for a lawyer, to obtain justice. Cambridge Trust Co. v. Hanify & King Professional Corp., 430 Mass. 472, 479 (1999). A lawyer is ethically bound to adhere to the Supreme Judicial Court’s rules of professional conduct governing contingent fee agreements. S.J.C. Rule 3:07 Rule 1.5(c). The reasonableness of a contingent fee is open to court review. Cameron v. Sullivan, 372 Mass. 128, 132 (1977); Gagnon v. Shoblom, 409 Mass. 63, 67 (1991).
LMA and Hamblett & Kerrigan entered into a contingent fee agreement which on its face met the criteria of the ethical rules. S.J.C. Rule 3:07 Rule 1.5(c)(1)-(6); (ex. 11). When Griffith left Hamblett & Kerrigan, LMA and Griffith modified and reaffirmed their contract in a signed document (ex.2). While this Court has an obligation to examine the reasonableness of the contingent fee agreement, we need only pause briefly in this regard for both sides’ expert witnesses testified the agreement was reasonable. The agreement called for the contingent fee percentage to decline as the case lingered. Griffith earned a 30% fee for his efforts at trial. His services on appeal garnered him another 7% per the agreement. The agreement was negotiated by the parties and fares well under the case law. See Smith v. Consalvo, 37 Mass.App.Ct. 192, 196-98 (1994); Gagnon v. Shoblom, 409 Mass. 63, 67 (1991); Cambridge Trust Co. v. Hanify & King, 430 Mass. 472, 479-80 (1991); Snow v. Mikenas, 373 Mass. 809, 812 (1977). The central issue in this action is whether *615 Griffith met all of his obligations under the contract such that he is entitled to payment.
All agree that Griffith performed masterfully in securing a $3,800,000 verdict. He overcame the hurdles of an oral contact set against a history of prior dealings between SMS and LMA in writing, of the amorphous nature of future lost profits as a measure of damages and of dealing with witnesses who varied in their recall of critical events. Moreover, he prevailed on appeal. LMA takes the position that Griffith failed to recover any money from SMS and that he failed to secure the judgment against SMS while the appeal was pending.
The latter claim can be dealt with summarily. Griffith obtained an injunction postjudgment barring SMS from disbursing its assets. No credible evidence was tendered at trial to suggest that SMS violated the injunction. LMA has argued that Griffith should have done more, perhaps in the way of trustee process on accounts in the name of SMS. Griffith took appropriate action by seeking the injunction and declined to go any further for fear of putting SMS out of business, i.e. for fear of choking off the veiy source of any recoveiy on the judgment. He did not breach his duty to LMA.
Griffith never did recover any money from SMS. Once SMS entered bankruptcy, Griffith had to turn to competent bankruptcy counsel. The final paragraph of the parties’ contingent fee agreement allowed Griffith to hire additional counsel. Nonetheless, Rafteiy was not expressly hired by Griffith. Rafteiy billed and was paid by LMA. Rafteiy never undertook the representation of LMA on a contingent fee basis.
On May 8, 1998, Griffith and Sherri Malouf modified the contingent fee agreement by substituting Griffith in place of Hamblett & Kerrigan and by having Griffith assume the responsibility of paying Hamblett & Kerrigan for services to date. The letter of May 8th is crucial in another respect. When Sherri Malouf and Griffith endorsed the letter, both understood that any recoveiy against SMS would come about by Raftery’s work in the bankruptcy proceeding. The clause, “all sums recovered by it on its behalf’ in the contingent fee agreement had taken on the meaning by May 8th in the minds of both parties as including any recoveiy from Rafteiy’s efforts. This is not an instance where the clause must be strictly construed to Griffith’s detriment despite his role as its author. Compare with Benalcazar v. Goldsmith, 400 Mass. 111, 114 (1987). From May 8th through March of 2000, Griffith provided services on the appeal.
In short, Griffith fully performed his obligations under the contract. LMA breached the contract as of May 31, 2001 when it failed to pay Griffith upon LMA’s acquisition of SMS. Let us turn to the question of damages.
Through the efforts of Griffith, LMA became the owner of SMS. Ideally, Griffith is entitled to 37% of the fair market value of SMS in early 2001 (absent any consideration of the debt due on LMA’s judgment) less LMA’s expenses in acquiring SMS (the bid price and Raftery’s fees). The value of SMS was never precisely established at trial. Given that SMS was worth at least $2,500,000 prior to the entry of the 1997 judgment, Griffith’s contingent fee award should be no less than $600,510 ($2,500,000 minus $877,000 times .37). Alternatively, justice would be done if Griffith was awarded a 37% ownership stake in SMS with appropriate adjustments for LMA’s acquisition costs and Malouf family salaries drawn post-acquisition. Practically speaking such a scheme is bound to fail for two reasons: first, the Maloufs have merged the operations of SMS and LMA, rendering a fractional share of SMS meaningless; and second, the parties would no doubt continue in litigation with a ruinous effect on the business.
On paper, what Griffith achieved for LMA was a substantial judgment, one which exceeded the worth of SMS. Pursuant to the bankruptcy reorganization plan, one can determine a fair value for the judgment reflecting the true worth of SMS in the form of the cash payouts to LMA per the plan. The cash payouts were established to reflect a fair distribution to LMA on its judgment regardless of the identity of the successful bidder at the auction. As the bid price increased, so did LMA’s cash payouts given that the bidders placed a higher value on SMS. The cash payouts per the plan totaled $1,889,825.30, based on LMA’s bid of $877,000 ($1,207,638.30 plus $682,187.04 (which is the total of $14,212.23 for 48 months)). Griffith’s 37% share is $699,235.36. Griffith’s share should not be reduced by a proportionate share of the bid price inasmuch as LMA made its bid so as to acquire SMS as a going concern, i.e., LMA got much more than the cash payouts inasmuch as LMA got a lucrative business entity which fit well with the expansion of its existing business. A rough comparison with the cash payouts had Moore’s bid been accepted, is useful. Moore bid $600,000, some $277,000 less than LMA. Under the terms of the bankruptcy reorganization plan, using Moore’s bid, the cash payouts would have approximated $1,612,825.34 ($1,207,638.30 minus $277,000, plus $682,187.04). At 37 percent, Griffith would have been entitled to $596,745.36 had Moore prevailed. LMA’s suggested calculation would leave Griffith with $374,745.36 ($699,235.36 minus 37 percent of $877,000), a figure far too low in relation to what LMA actually acquired through Griffith’s efforts.
Throughout the bankruptcy proceedings Rafteiy pursued two goals for his client LMA: to acquire SMS and to collect on LMA’s judgment. Fairness dictates that Rafteiy’s fees be split so that half is allocated toward the acquisition of SMS and half toward collecting on the judgment. Griffith should bear the burden of half of Rafteiy’s fees, thus Griffith’s share should be reduced by $15,000.
*616 In summary, Griffith and LMA entered into a binding contract whereby Griffith agreed to provide legal services and LMA agreed to pay for those services based on the value of LMA’s recovery. Griffith fulfilled his obligations under the contract, LMA has breached the contract. Mathematical precision is not required in the computation of damages. See Rombola v. Cosindas, 351 Mass. 382, 385 (1966); Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 491 (1994) (as long as reasonable calculation of damages can be made, defendants should not escape consequences of wrongful conduct). The court finds that the fair and reasonable measure of damages is 37 percent of the proceeds ordered paid to LMA under the bankruptcy reorganization plan, i.e. $699,235.36, less $15,000 for Raftery’s fees, equaling $684,235.36. The figure just established by the court is a damage award. It represents the findings of the court as to the sum which will fully and fairly compensate Griffith for LMA’s breach of contract. While the measure of damages was a percentage of the total cash payout under the bankruptcy reorganization plan, the award is not contingent upon SMS actually making the cash payments to LMA.
The Maloufs have operated SMS and LMA as a single entity from which they withdrew as much liquidity as possible. The Maloufs have reaped large salaries and paid off the substantial loan from Leroy Malouf at the expense of LMA’s other creditors, in this instance Griffith. It was the intent of Sherri Malouf and LMA to pay Griffith nothing despite his efforts and his services. The control of SMS and LMA by the Maloufs has clearly resulted in injury to Griffith. By commingling the business of the two corporations, the Maloufs have managed to deplete SMS’s cash flow so that SMS has not made the final 25 monthly payments required under the bankruptcy reorganization plan, solely to the detriment of Griffith, given the pretrial injunction which required LMA to escrow the periodic payments.
In “rare particular situations to prevent gross inequity,” disregard of separate corporate entities may be warranted. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1968). Occasion for doing so arises when there is active and pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequence by reason of the relationship among those business entities or where there is a confused intermingling of the two corporations engaged in common enterprise with substantial disregard of the separate nature of the corporate entities. Id. at 619. The Appeals Court more specifically enunciated the principles of My Bread Baking Co. with reference to twelve factors. See Evans v. Multicon Construction Corp., 30 Mass.App.Ct. 728 (1991). The court identified the factors one should consider as: “(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud.” Id. at 733, citing Pepsi-Cola Metropolitan Bottling Company v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985). Although not all of the factors support treating SMS and LMA as one entity, the factors that do, common ownership, pervasive control, and siphoning away of corporate assets are persuasive.
For the purposes of the award and the payment of Griffith’s legal fees, the corporate distinction between LMA and SMS should be abrogated. LMA’s argument that Griffith cannot collect his 37 percent of SMS’s periodic payments to LMA until they are paid amounts to naught. Likewise, LMA’s argument that prejudgment interest should run only as to sums paid or due from SMS is not persuasive. Surely, it is true that an attorney’s contingent fee becomes due on the date the client receives payment. Smith v. Consalvo, 37 Mass.App.Ct. 192, 199 (1994). LMA received “payment” the day LMA took control of SMS. This court’s award of damages is not keyed to the actual payment of the 48 installments by SMS. To rule otherwise would give the Maloufs the power to continue to deny Griffith his just reward.
The analysis to this point rests on the finding that Griffith fully performed under the contract while LMA breached the same. Should this analysis not withstand appellate review it is appropriate to consider this case within the framework of Salem Realty Co. v. Matera, 384 Mass. 803 (1981 rescript). In Salem Realty, the Supreme Judicial Court left open the possibility of an attorney recovering on a contingent fee agreement on the basis that he or she had rendered substantial performance. The Supreme Judicial Court has suggested some of the factors a trial jurist should consider in such a circumstance, including the bad faith of the party terminating the agreement, the extent of work left undone, the cost to the client of legal services to complete the case, the conduct of the initial attorney, and the language of the fee agreement. Salem Realty Co. v. Matera, 384 Mass. at 804.
The case at hand passes muster under Salem Realty. Griffith took SMS’s suit against LMA to judgment on the counterclaim. All that was left for Rafteiy was to collect on the judgment in an arena Griffith feared to tread. Surely Griffith should not be penalized for recognizing the highly specialized nature of bankruptcy work and urging his client to hire competent counsel. While Griffith acted in good faith in securing Rafteiy for LMA, LMA acted in bad faith by jettisoning Griffith’s claim to pursue the business and personal *617 goals of the Malouf family. The fee agreement contained provisions for the compensation of the attorney if he was prematurely discharged “without cause.” The agreement called for a fee which was the higher of 125% of the attorney’s hourly rate to date or the appropriate contingent fee based on the highest settlement offer to date. The discharge payment provisions of the agreement were to take effect “If LMA discharges Hamblett & Kerrigan P.A. at any time prior to the final resolution of the legal actions covered by this agreement ...” The case of SMS v. LMA had reached its final resolution. The fee agreement clearly did not envision Griffith’s discharge during the collection phase of the agreement and should not control the outcome in a Salem Realty context. Griffith is entitled to his contingent fees under a theory of substantial performance.
Should an appellate court reject Griffith’s recovery on full or substantial performance, Griffith is entitled to an award on quantum meruit. Quantum meruit is a recovery based on the implied agreement between the parties. This Court may consider a wide range of factors in setting the recovery, including: the ability and reputation of the attorney, the demand for his or her services by others, the amount and the importance of the matter involved, the time spent, the fees usually charged for similar work by other attorneys, the amount of money and the value of the property affected by the controversy and the results secured. Mulhern v. Roach, 398 Mass. 18, 24 (1986). All of these factors have been the subject of the court’s findings of fact set forth above and need not be rehashed. Griffith worked 1000 hours and should be paid at a rate of $350 per hour. Junior attorneys devoted 335 hours to the case at a rate of $120 per hour. While the $350 per hour figure is greater than Griffith’s hourly rate in the 1990s, the figure accurately accounts for the factors set forth in Mulhern by which LMA realized added value. On a quantum meruit basis, Griffith is entitled to a fee of $390,200.
Griffith seeks multiple damages and attorneys fees against LMA pursuant to G.L.c. 93A, §§2 & 11. The short answer to the claim is that the practice of law and the pursuit of legal fees arising therefrom is neither trade nor commerce as required under Chapter 93A but rather the practice of a traditional profession. Absent a direct ruling from the appellate courts, this jurist is content to read the legal tea leaves and preclude Griffith’s claim on the basis of cases such as Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 463 (1997), First Enterprises Ltd. v. Cooper, 425 Mass. 344, 347-48 (1997), and Logotheti v. Gordon, 414 Mass. 308, 312 (1993).
To this point, we have been concerned with whether Griffith was due a recovery and, having so found, in what amount. Let us turn our attention to the practical question of how Griffith gets paid. By Count I of his Second Amended Complaint, Griffith seeks a lien pursuant to G.L.c. 221, §50. Per that statute, Griffith is entitled to a lien on the proceeds derived from the counterclaim he championed. This lien takes priority over other liens arising after the commencement of the underlying action. See PGR Management Company v. Credle, 427 Mass. 636, 640 F (1998). An inchoate lien dates to the attorney’s entry of appearance, maturing upon entry of judgment. The lien attaches directly to any proceeds of that judgment. G.L.c. 221, §50. The wording of the statute makes clear that monetary awards are considered “proceeds” of that judgment and are subject to the lien. See, e.g., Craft v. Kane, 51 Mass.App.Ct. 648, 653 (2001) (“the lien attached to the $7,500 arising under the stipulation of dismissal”).
In short, the proceeds of the judgment include the payments made by SMS to LMA. Thus, the initial payment of $1,207,638.30 was impressed with Griffith’s lien. To facilitate the purchase of SMS, Leroy Malouf loaned $827,000 to LMA. The loan occurred after Griffith’s inchoate lien was established. When the $1,207.638.80 hit the books of LMA, the Maloufs made it their first order of business to repay Leroy the $827,000. Leroy Malouf, as an officer in LMA and as a material participant in LMA’s counterclaim against SMS, was fully aware at the time of the loan and at the time of its repayment that Griffith had a superior right to the funds to the extent of his legal fees. The repayment of the loan and LMA’s rapid disbursement of the remainder of the $1,207,638.30 were designed to thwart Griffith. It is this type of knavery that the attorney’s lien statute was designed to prevent. Boswell v. Zepher Lines, Inc., 414 Mass. 241, 248 (1993). Leroy Malouf is individually liable for the sums due Griffith to the limit of $827,000.
The plaintiffs motion to amend seeks an order to reach and apply assets owed to LMA held in SMS’s hands. One must remember that the court has abrogated the distinction between SMS and LMA only as to Griffith’s claims. To the outside world, the two corporations may well appear separate. To the extent that SMS has assets apart from LMA, the balance of this paragraph applies. Griffith established at trial that LMA owes him a debt for services rendered. This is the first step in any reach and apply process. See Stockbridge v. Mixer, 215 Mass. 415, 418 (1913). The second step of a reach and apply claim “is the process for collecting the debt.. . out of property rights which cannot be reached on execution.” Id. at 418; see also Springfield Redevelopment Authority v. Garcia, 44 Mass.App.Ct. 432, 436; G.L.c. 214, §3(6). SMS holds property rightly due LMA. Through neglect on the part of LMA, the payments scheduled in the bankruptcy plan have not been collected. Griffith is entitled to the full amount of any payment made by SMS to LMA up and until judgment is satisfied.
Additionally, the plaintiffs also seek an order, ostensibly under the reach and apply statute, ap *618 pointing a special master to liquidate the SMS stock held by LMA. There has been no showing made by the plaintiff that the property is of the kind that cannot be reached upon execution, as normally required as the second step of a reach and apply claim. Stockbridge, 215 Mass. at 418. The plaintiffs rely instead on the principle that where a preliminary injunction is granted, an equitable attachment is established. See Bank of Boston v. Hauffler, 20 Mass.App.Ct. 668, 673 (1985) (granting preliminary injunction to banks in support of reach and apply claims created an equitable attachment). However, the cases cited by the plaintiff use the concept of equitable attachment only to establish the priority of liens, not as a vehicle to liquidate assets. See id. The court is not persuaded that it should exercise its equitable powers to liquidate the SMS stock held by LMA. LMA owes a debt to Griffith. Presumably, LMA will use whatever assets it has on hand to satisfy its obligation. The plaintiff did not present any evidence at trial demonstrating that a court-ordered liquidation of assets is warranted or necessary. Therefore, this court will deny the plaintiffs request to liquidate SMS stock held by LMA.
The plaintiff has requested that this court order Tredegar Trust to pay over any sums held in the name of or for the benefit of Leroy Malouf. The evidence presented at trial was sparse with respect to Tredegar Trust. Based on the court’s analysis of Leroy Malouf s obligation to Griffith, Griffith would be entitled to act on assets held by Tredegar Trust either in the name of Leroy Malouf or for his benefit. However, LMA asserts that the assets held by Tredegar Trust are in the form of an individual retirement account that is statutorily exempt from attachment or execution per G.L.c. 235, §34A.
The court is placed in a difficult position by the lack of evidence presented on the nature of Leroy Malouf s holdings with Tredegar Trust. The plaintiff has established that Leroy Malouf received funds that were impressed with a statutory lien in Griffith’s favor. Leroy Malouf has been held liable to Griffith for the funds that he received that were the subject of that lien. No credible evidence shows the nature of the account(s) held by Tredegar Trust. No relief based on a theoiy of fraudulent conveyance has been requested. In light of the assertion that the account in question is an IRA not subject to levy or execution, the court will limit any recovery on behalf of Griffith to funds held by Tredegar Trust in the name of Leroy Malouf or for his benefit that are not exempt as contemplated by G.L.c. 235, §34A.
Pursuant to the preliminary injunction, LMA placed in escrow a limited number of the monthly payments received from SMS pursuant to the bankruptcy reorganization plan. The payments, plus accrued interest, totaling $206,454.17, were paid to Griffith by agreement of the parties on April 15, 2004. The defendants are entitled to a credit in that sum effective that date. The judgment of $684,235.36 began accruing prejudgment interest effective from the filing date of this action, June 13, 2001.The total of the award plus prejudgment interest to April 15, 2004, should be calculated by the clerk and then the $206,454.17 should be applied first to interest with the remainder, if any, to the award. Thereafter, pre- and post-judgment interest will accrue as is the custom.
ORDER
For the above-stated reasons, it is ORDERED that judgment be entered for the plaintiff on the Second Amended Complaint as follows:
1. The Court’s Findings of Fact, Rulings of Law, and Order for Judgment, dated August 11, 2004, and any judgment entered thereon be VACATED;
2. on Count I against Malouf, Inc. d/b/a LMA, Inc. in the SUM of $684,235.36 with interest, costs, and appropriate credit for the payment of $206,454.17;
3. on Count I against Leroy Malouf DECLARING the sum of $827,000 paid to him by the corporate defendant on or about May 31, 2001, was impressed with a lien for the judgment set forth above and ENFORCING said judgment and lien against Leroy Malouf, individually, up to the sum of $827,000;
4. on Count II against Situation Management Systems, Inc. ORDERING said corporation to pay to the plaintiff any and all sums the reach and apply defendant is holding for, or owes to, Malouf, Inc. d/b/a LMA, Inc. up to the sum of the judgment set forth above;
5. on Count IV against Tredegar Trust ORDERING said trust to pay to the plaintiff any and all sums said trust is holding for, or owes to, Leroy Malouf up to the sum of the judgment set forth above but excluding therefrom any sums protected by G.L.c. 235, §34A; and
6. that Counts III, V, VI, and all counterclaims be DISMISSED.

Leroy Malouf apparently borrowed the $827,000 from his IRA or pension account. In any event, the funds flowed into LMA free of any restriction.

Two figures have been used for the cash payout. The figure of $1,207,638.30 appears in exhibit 29, paragraph 22 as an agreed amount. The figure of $1,203,528.20 appears in the correspondence of the parties. The stipulated figure is adopted by the Court.

The Court does not credit Sherri Malouf s testimony to the effect that LMA always intended to pay Griffith. To the contrary, LMA entered the present litigation stating a counterclaim and denying any right by Griffith to payment. Only at trial did LMA assume a conciliatory posture.